UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

CARYL E. TAYLOR, Individually          )
and as personal representative of the   )
Estate of MARK E. TAYLOR, deceased,   )
                                       )
            Plaintiff                  )          Civil No. 06-69-B-W
                                       )
        v.                             )
                                       )
FORD MOTOR COMPANY,                    )
                                       )
            Defendant                  )

PLAINTIFF'S STATEMENT OF
ADDITIONAL MATERIAL FACTS

1.    Mark Taylor and his wife Caryl lived in Campton, New Hampshire from October 1998
      until the time of Mark's death on June 2, 2004. (Exhibit 1 at 5:5-16)

2.    At the time of his death, Mark Taylor worked as a salesman for Sawtelle Brothers located
      in Lawrence, Massachusetts.  Sawtelle Brothers sold cutting and aerification equipment
      for golf courses and college fields. (Exhibit 1 at 29:19 – 30:13)

3.    Mark Taylor worked 40 to 50 hours per week mostly on the road, delivering equipment
      and making personal contacts with customers in his sales area consisting of New
      Hampshire from Concord north, all of Maine, and northern Vermont. (Exhibit 1 at 34:13
      – 37:3)

4.    When Mark Taylor left for Maine the day before his death, he was hauling a trailer with
      two pieces of equipment – riding mowers – to deliver in Bangor to a golf course. (Exhibit
      1 at 43:23 – 47:3)

5.  Mark Taylor regularly carried equipment on a trailer attached to the Ford F-250 involved in the accident. In the summer time, he was pulling the trailer with equipment about 80% of the time. (Exhibit 1 at 47:24 – 48:2; 100:2-18)

6.  Mark Taylor purchased the F-250 involved in the accident on December 21, 2001 from Newman Ford in Salem, New Hampshire. (Exhibit 1 at 101:2-9; Exhibit 15)

7.  The F-250 was a 2002 model year, 4x4 Super Duty, Super Cab, with XLT Trim, a 5.4 EFI V-8 Engine and an electronic 4 speed automatic transmission.  The truck was manufactured on November 21, 2001.  MSRP was $29,550.00. (Exhibit 2C)

8.  The accident on June 2, 2004, occurred approximately 25 miles north of Orono, Maine on Interstate 95.  Trooper Vittum, who responded to the accident, reported there were heavy rains in the area, with torrential downpours in some spots, and then no rain or light rain in other areas along the road. (Exhibit 3 at 11:2-25)

9.  Mark Taylor was traveling north on Interstate 95 when, returning to the travel lane after passing three vehicles, he lost control of his F-250 pickup. (Exhibit 4 at 24:13 – 25:2)

10.  Mr. Taylor lost control of the pickup because the trailer he was hauling started fishtailing and because there were grooves and standing water in the roadway. (Exhibit 4 at 24:22 – 25:2)

11.  The F-250 crossed over the passing lane and headed down the embankment in the median going sideways, furrowing the grass, and then going into a roll, passenger side first. (Exhibit 4 at 25:3 – 26:5)

12.  The pickup rolled two times, landing on its wheels with the trailer still attached by the safety chain (Exhibit 4 at 28:9-13; 34:25 – 36:2; Exhibit 16)

13.    Ben Kittredge, M.D., a medical examiner for the State of Maine was called to the accident scene. (Exhibit 5 at 8:18-23)

14.    Dr. Kittredge observed Mark Taylor's body lying in the median, covered with a tarp, some 50 to 65 feet from the F-250. (Exhibit 5 at 9:10 – 11:6)

15.    There were several deposits of brain tissue between the F-250 and the body. (Exhibit 5 at 9:20-21; Exhibit 16; Exhibit 4A)

16.    Dr. Kittredge observed a very severe crush injury to Mark Taylor's head and a gaping wound and obvious disruption of brain tissue within the skull.  He did not find any indications of injuries to Mr. Taylor beside those to his head. (Exhibit 5 at 11:15-25; Exhibit 17)

17.    Mark Taylor was 6'2" tall.  (Exhibit 1 at 98:11-12)

18.    Dr. Kittredge estimated Mark Taylor's weight at  300 pounds. (Exhibit 5 at 14:4-11)

19.    Mark Taylor was 55 years old at the time of his death. (Exhibit 5A)

20.    There was no alcohol involved in the accident. (Exhibit 4 at 47:16-18)

21.    A vehicle autopsy was performed on the F-250 and trailer involved in the accident. Trooper Jason Sattler's Forensic Vehicle Inspection conclusion was: "All tires were good/fair.  No defects were found on this vehicle that would have contributed to the collision." (Exhibit 4 at 47:20 – 48:5; Exhibit 4A)

22.    Trooper Darren Foster, the Maine State Police crash reconstruction specialist, performed an accident reconstruction of the Taylor rollover crash.  Trooper Foster firmly believes the truck rolled only two times based on marking out the distance of debris and lining up where the vehicle came to rest.  (Exhibit 4 at 4:5-18; 28:9-23)

23.    Ford's expert on the motion of the vehicle in the accident, David W. Mercaldi, concluded

that the Taylor truck most probably rolled two times. (Exhibit 18 at 8)

24.    Looking at on-road rollovers, not including urban events, the Taylor rollover was an

average event and not at the extreme in severity.  The fact that the Taylor rollover

occurred on wet, soft ground, rather than asphalt or concrete, helped to make this crash

less severe than an actual on-road rollover.  (Exhibit 17 at ¶¶13-16)

**Mechanism of Mark Taylor's Fatal Injury**

25.    Dr. Kittredge determined that the cause of Mark Taylor's death was severe brain damage.

(Exhibit 5 at 12:2-8)

26.    Mr. Taylor's head was more than likely crushed between the window frame and the roof

rail. (Exhibit 17 at ¶ 12)

27.    At the one and three quarter roll point, Mr. Taylor's head was between the driver's door

window frame and the roof rail where it got pinched between the two when the vehicle

roof made contact with the ground, causing the defect in his skull.  (Exhibit 6 at 30:22 –

31:3; 33:22 – 34:10)

28.    The deformation and destruction of the occupant survival space directly resulted in Mr.

Taylor's injuries.  (Exhibit 6 at 18:19-24)

29.    Ford's expert on biomechanics, Catherine Ford Corrigan, Ph.D., agrees with Plaintiff's

expert that Mark Taylor's fatal injury was caused by entrapment of his head after it

moved through the space between the window frame and the roof rail that was opened

due to loading by Mr. Taylor's body during the rollover.  Mr. Taylor's head was not

displaced laterally through the window opening.  (Exhibit 19)

30. After Mark Taylor's head injury, the driver's side doors came completely opened, and he was ejected through the open portal. (Exhibit 6 at 38:12-22)

31. Mark Taylor's body flew from the vehicle approximately 65 feet to its point of rest. (Exhibit 6 at 39:17 – 40:1)

32. Mark Taylor did not sustain his head injury as a result of his ejection from the vehicle as evidenced by the presence of pieces of brain both before and after the final rest position. (Exhibit 6 at 40:24 – 41:20; Exhibit 19 at 5)

33. Dr. Kittredge performed an external examination of Mark Taylor's unclothed body at the funeral home. He did not observe any injuries other than the head injury. (Exhibit 5 at 13:8-17; 11:15-25)

34. No autopsy was performed because the cause of death was so apparent. (Exhibit 5 at 12:9 - 13:7)

35. In all probability, if the roof structures had remained intact and Mark Taylor had remained in the vehicle throughout the rollover, he would not have suffered any significant or life threatening or fatal injury. He might have some bumps and bruises, and minor orthopedic injuries, but nothing debilitating. (Exhibit 6 at 66:22 – 67:8)

36. The risk of sustaining a diving-type, cervical spine injury if the roof had remained intact is a possibility, but not a probability. (Exhibit 6 at 67:9-18)

**Deformation of the Taylor F-250**

37. The roof of the Taylor F-250 was visibly severely deformed in the rollover accident. (Exhibit 7B at 4, 8, 9)

38. Jeffrey Croteau, Ford's expert on the performance of the roof in the Taylor F-250, has quantified the amount and direction of roof deformation using photogrammetric analyses

5

of the subject vehicle and an undeformed exemplar F-250. (Exhibit 50 at 4 – 7; Exhibit 7I at 2-4)

39.   According to the spreadsheet prepared by Mr. Croteau, the top of the left (driver's side) C Pillar was displaced 3 inches forward, 9.4 inches inboard, and 8.5 inches downward. Photographic evidence shows that the C Pillar collapsed toward the middle.  (Exhibit 50 at 7; Exhibit 2A; Exhibit 7C at 7)

40.   According to the spreadsheet prepared by Mr. Croteau, the roof rail at the top of the right (passenger side) B Pillar was deformed 5 inches forward, 7.7 inches inboard, and 7 inches down. (Exhibit 50 at 7)

41.   According to the spreadsheet prepared by Mr. Croteau, the roof rail at the top of the left B Pillar (driver's side), was deformed 2.3 inches forward, 6.8 inches inboard, and 4.5 inches downward.  Photographic evidence shows the left roof rail hitting the middle of the driver's headrest.  (Exhibit 50 at 7)

42.   All four doors of the Taylor vehicle were found open at the scene of the accident. (Exhibit 3 at 26:25 – 27:6; Exhibits 7A and 7B)

43.   The rear door upper latches failed (separated) due to a structural root cause which occurs when the latch and striker separate due to deformation or fracture of either subcomponent.   According to Mr. Salmon, "the extreme forces experienced in this accident appeared to have been of sufficient magnitude to deform both upper latch plates to a point that would allow separation of the latches from their strikers.  The left hand upper latch plate had tearing in the root of the latch fishmouth that resulted in opening of the fishmouth providing space for the latch and striker separation. (Exhibit 20 at 4)

44.   Deformation of the top of the door opening (roof rail) resulted in combined planar and rotational loading between the rear door upper latches and strikers that "overwhelmed" the latches allowing them to separate from their strikers. (Exhibit 20 at 6)

45.   The failure of the rear door upper latches occurred first, before the failure of the front door latches. (Exhibit 7 at 55:4 – 56:22)

46.   Once the upper latches had failed, the loading from inside the vehicle on the driver's side caused the front door latch to separate from its striker. (Exhibit 7 at 56:13-22)

47.   The root cause of the front door latch failure was by-pass, *i.e.*, a combination of transverse and longitudinal loading which bent the latch plate, offsetting the detent lever about 4 mm from the latch plate thereby allowing the fork bolt to rotate between the detent lever and the latch plate and release the striker. (Exhibit 20 at 4; Exhibit 7 at 55:4 – 57:4; Exhibits 7F and 7G; Exhibit 7C at 17, 18)

48.   Longitudinal loading on the front door latch and striker can be likened to the tension in a rope suspended between two poles with clothes hanging from the rope providing a transverse load. (Exhibit 7 at 56:13 – 57:25)

49.   The transverse outboard loading on the driver's side door may have been caused by Mark Taylor's weight against the door. (Exhibit 7 at 59:1-11)

50.   The fishmouth (opening in the latch plate to allow the striker to enter the latch) of the driver's side front door latch was deformed.  The front door latch on the Taylor vehicle has a standard undeformed fishmouth opening of 10 mm.  The fishmouth on the Taylor vehicle measured after the accident, was 14 to 15 mm.  Testing has demonstrated that a residual (plastic) deformation of 3 mm or greater, indicates there has been a temporary (elastic) deformation sufficient to allow rotation of the fork-bolt past the detent, thus

opening the latch.  The left front door may have opened during the accident by vertical deformation of the latch fishmouth. (Exhibit 7 at 46:3-4; Exhibit 20 at 6, Conclusion (3); Exhibit 7C at 15, 16)

51. The right hand front door had debris packed into the fishmouth so that Mr. Salmon was unable to investigate the root cause of that latch failure. (Exhibit 7 at 27:16 -  28:2; Exhibit 7C at 35, 36)

52. There was debris packed into the opening for the inside handle of the right hand front door. Police photographs show that the debris was present in the door handle immediately after the accident. (Exhibits 7A and 7E)

53. Because there was damage from the door being folded back onto the fender, it suggests the door may have opened in the accident. (Exhibit 7 at 21:6 – 28:9)

**PHN131 Platform Vehicles - Background**

54. The Ford Super Duty F-250 is one of the PHN131 platform vehicles designed and developed at Ford between 1993 and the January 5, 1998 Job One date when they were first sold to the public.  (Exhibit 8 at 13:2 – 14:24; Exhibit 9 at 10:12-23)

55. PHN is Ford's code name for Pickup (P), Heavy truck (H), North American market (N). (Exhibit 8 at 13:21 – 14:12)

56. Ford had F-Series trucks as far back as the 1980's including the F-150, F-250, F-350 light duty and super duty.  (Exhibit 8 at 16:7-15)

57. In the 1990's, Ford segregated the pickup truck business into the PHN131 and PN96 platforms.  The PN96 included pickups with a Gross Vehicle Weight (GVW) of 8,500 pounds and under, while the PHN131 comprised pickups, chassis cabs, medium trucks and stripped chassis over 8,500 lbs GVW. (Exhibit 7J at 1, 3)

58.     The PHN131 trucks have three cab configurations: the 2 door Regular Cab; the 4 door

        Super Cab, and the 4 door Crew Cab. (Exhibit 7J at 7)

59.     The four-door feature of the Super Cab was an industry first, classified by Ford as a

        "surprise and delight." (Exhibit 7J at 7; Exhibit 21 at 3, 5)

60.     The PN96, introduced in 1996, had a three-door Super Cab with the third door on the

        passenger side. (Exhibit 22; Exhibit 8 at 47:5-17)

61.     The doors on the Super Cab are sometimes referred to as 60/40 doors, with the front

        doors being larger than the rear. (Exhibit 7 at 140:5 – 141:12; Exhibit 23 at 2)

**PHN131 Super Cab Doors and Latches**

62.     The PHN131 F-250 Super Cab rear door latching system included a D5 upper latch and a

        D21 lower latch. (Exhibit 7 at 178:9 – 179:6; Exhibit 23)

63.     The latch on the front door was a D21, which engaged a striker mounted on the pillar

        formed by the rear door. (Exhibit 7 at 178:6-18; Exhibit 23)

64.     The D21 latch was first used in 1992 on the Econoline Van.  The D stands for Dortec, the

        supplier of the latch.  (Exhibit 24 at 12)

65.     The D5 latch was also introduced in 1992 and used on the cargo doors of the Econoline

        Van for side and back cargo door applications and on the third doors on the F-Series and

        Ranger trucks. The D5 latch is very small in size, and is <u>always used along with</u> a D21

        style latch in van side cargo or back cargo door latching systems. (Exhibit 24 at 13)

66.     Ford's doors and door latch expert, James Salmon, could not say what the relative

        strength was between the D21 and D5 latch because the Super Cab rear door D5 upper

        and D21 lower latches were tested for strength together, as a system, and not

        individually.  (Exhibit 7 at 73:8 – 75:3; 180:3-11; Exhibit 25; Exhibit 26 at 10)

67.     Ford's MY 1999 Compliance Demonstration Plan and Report indicates that the Super Cab rear door latches were tested for regulatory purposes, under Section S4.2 of FMVSS 206, as Hinged Cargo-Type Side Doors. (Exhibit 25 at 3, section S4.2.1)

68.     Cargo-Type Doors are defined by FMVSS 206 as "a door designed primarily to accommodate cargo loading including, but not limited to, a two-part door that latches to itself." (Exhibit 27 at 2)

69.     Pursuant to FMVSS 206, when more than one latch system is used on a single door of hinged cargo-type side doors, the <u>transverse</u> load requirement may be divided among the total number of latch systems. (Exhibit 27 at 5)

70.     The substantiating documentation submitted by Dortec Industries to demonstrate compliance of the P131 Super Cab Rear Cargo Side Doors with FMVSS 206, dated February 3, 1997, indicates that the upper and lower latches were tested as systems. There were no separate tests identified for the D5 upper latch in either the transverse or the longitudinal direction.  The reported results of the Super Cab rear door latch strength tests are only slightly higher in the Longitudinal direction than the reported test results for the PHN131 front door latch.  The rear door latches actually tested lower than the front door right latch in the transverse direction.  The D21 front door latch used in the PHN131 was certified using test results from the DN 101 (Taurus) platform vehicles. (Exhibit 26 at 1-14; Exhibit 26 at 15-26)

71.     When asked in this case whether the Super Cab upper latches had ever been tested to determine how much force it would take to separate the latch from the striker, Ford's corporate designee on doors and latches, James Salmon, boasted that the latches had been

10

tested for FMVSS 206 and "there is a significant margin between latch performance and what's – what is federally required." (Exhibit 7 at 110:3 – 112:16)

72.     An April 7, 1994 Engineering Report on a D21 Latch Assembly Analysis was presented to Ford Motor Company.  The paper reported on a project to develop an analytical simulation technique to study the effects of static and dynamic loading on the D21 door latch and striker. (Exhibit 28 at 3)

73.     The authors of the April 7, 1994 paper concluded that an analytical tool had been developed to model the behavior of the D21 latch assembly during impact.  The  model had been shown to agree with physical testing.  The latch assembly was weakest when pulled in the longitudinal direction.  The latch frame bent allowing the ratchet [fork bolt] and pawl [detent lever] to disengage.  Structural changes designed to improve latch retention have been considered.  Slight improvement was observed. (Exhibit 28 at 22)

74.     Internal Ford documents demonstrate that in 1995, the D5 latch was tested for static strength to determine whether it would meet the requirements for NHTSA's new rule extending FMVSS 206 requirements to back doors.  The new rule was set to go into effect on September 1, 1997.  Testing revealed that the D5 latch on the VN127 cargo door did not meet the strength requirement and would require a strength upgrade; however, the vehicle was scheduled to be phased out prior to 9/1/97.  (Exhibit 29)

75.     The new rule required each latch used on vehicle back doors, such as hatchbacks, of passenger cars and multi purpose passenger vehicles (MPVs) with a gross vehicle weight rating of 10,000 pounds or less to withstand specified test loads in three directions (in contrast to two directions for side doors) without separation.  NHTSA rejected Toyota's suggestion that for doors fitted with more than one latch, the specified load be divided by

11

the number of latches on the door.  NHTSA stated that "real world crash data show that latch failures are the dominant cause of door openings and that they are seldom loaded symmetrically.  Since side door latches that individually meet the requirements of Standard No. 205 have significantly reduced side door openings in crashes and have saved an estimated 400 lives per year, NHTSA has decided that the proposed requirements should be applied to each back door latch tested."  (Exhibit 30 at 5)

76.     In October, 1997, Ford became aware that some lower latches on the 40% door of the 60/40 cargo doors on the 1997 Econoline were non-functional, *i.e.*, the latch would not engage when the door was closed. The lower and upper latches were D5 latches.  (Exhibit 31 at 1-2)

77.     A manufacturing anomaly was discovered to be the cause of the non-functioning latches. On November 14, 1996 it was revealed that 1,773 latches from a stamping made on August 28, were suspect. (Exhibit 31 at 1)

78.     On November 21, 1996 it was reported that strength testing on the D5 upper latch only resulted in 1,828 lbs, whereas FMVSS  206 requires 2,000 lbs and the Ford specification is 2,500 lbs. (Exhibit 31 at 2)

79.     On December 5, 1996 it was reported that both D5 latches will fail well before the D21 center latch fails, therefore the controlling part is the D21.  In addition, Design Analysis Engineering had had no claims or lawsuits related to the latches on those doors. (Exhibit 31 at 2)

80.     On March 13, 1997, the matter was closed without a campaign (recall) for the affected latches with the approval of ASES and AVT and PVT management.  The reasons given were that the binding/sluggish latch has no adverse effect on vehicle operation; latches

will tend to correct within first hundred cycles of use, the non-functioning 40% door lower latch does not affect the ultimate load carrying capability of the door latch system. (Exhibit 31 at 3)

81.    A 1998 Society of Automotive Engineers (SAE) paper 980028 titled "Door Latch Strength in a Car Body Environment" authored by Andrew Gilberg, John Marcosky, Linda Sherman, and Richard Clarke, described a latch strength test designed to more realistically mimic the forces encountered in real-world crashes than the testing performed for FMVSS 206 purposes. (Exhibit 7K at 1)

82.    SAE 980028 proposed a latch strength test that would apply a load in the longitudinal and transverse directions simultaneously by applying a load of 3,200 lbs at about 39 degrees off the vehicles longitudinal axis.  This load was derived by combining vectorially the loads applied in separate tests by the existing FMVSS 206 requirements. (Exhibit 7K at 2)

83.    The authors of SAE 980028 also proposed conducting the test with the latch mounted in the door in which it was used by the manufacturer.  They reasoned that door sheet metal is typically .75 mm thick, while the testing fixtures used in test machines is typically 2.4 to 3.2 mm thick, thus substantially reinforcing the latch frame. (Exhibit 7K at 1-3)

84.    In a series of Ford internal emails dated September, 2002, it is revealed that Intier had tested the D21 latch at 39 degrees off the vehicle longitudinal per SAE 980028.  The D21 test results were thought to be good.  However, the tests were done on a fixture and not in the door.  The D5 latch was not tested "because it is never used alone to hold a door, instead, always with a D21." (Exhibit 32)

85.  Intier and Dortec (maker of the D21 and D5 latches) were at the time both part of Magna International.  Intier was the testing end of the business. (Exhibit 7 at 176:13 – 177:1)

86.  On August 16, 2002, Ford employees, F. Charette, M. Rogers, T. Pershing, M. Gharib and A. Fang authored a document titled "SD-Weather seal plug inserts to reduce door chucking" in which they revealed "The Super Duty team is working on Door Chucking failures for the Super cab (worst case scenario since it has no B-pillar).  The latch/striker area is the main focus, as there are no constraints built into the design, which is a major reason why there is considerable movement in the doors.  The competitors, however, use bumpers and wedges to help constrain the doors laterally and vertically." (Exhibit 33)

87.  "Chucking" means making noise. (Exhibit 7 at 173:2)

88.  An October 29, 2002 PowerPoint presentation titled Squeak & Rattle P131 Door Chucking High Mileage Project reveals that a Squeak and Rattle Affinity Team had been originated in September 2001 and several fixes were implemented to reduce N40-Front Side Door Squeak and Rattle including: on October 1, 2001, the Super Cab upper striker was lowered by 2 mm; on July 19, 2002 the striker plate gauge was increased from 1.2 mm to 1.5 mm; and on May 30, 2002 the rear door striker was moved back to its nominal location.  (Exhibit 34 at 2)

89.  Several changes were planned for the D21 latch in the 2002 time period.  One change involved modification of the detent lever or pawl due to concern with the inertial performance of the D21.  In order to meet LINCAP requirements (exposing the latch system to simultaneous impulses in the X, Y and Z axes), the mass of the pawl and release drive train were to be reduced, and the pawl center of gravity moved below the

14

pivot in the Y direction. Other changes were related to the chucking problem, and child locks. (Exhibit 35; Exhibit 36)

90.   In January, 2004, Greg Davis, a Technical Specialist at Intier Automotive authored an Engineering Report titled "P131 and U137 Front Door Latching System Pulse Analyses." The stated purpose of the analysis was "to determine if unlatching is predicted for the P131 and U137 Front Doors, given accelerometer inputs from actual vehicle test crashes." (Exhibit 37 at 3)

91.   The Summary section of the Engineering Report stated: "Latching system failure is predicted; this correlates with actual crash results.  The outside handle assembly is the cause of the failures, due to its response from the high lateral acceleration inputs." (Exhibit 37 at 3)

92.   The Engineering Report Recommendations were: "The outside handle assembly should be modified to reduce outside handle rotation during a side-impact crash." (Exhibit 37 at 3)

93.   On May 18, 2004 Intier submitted to Ford Intier Automotive's report demonstrating compliance with FMVSS 206 of all door latching systems for the 2004 MY P131 and U137 Regular/Super/Crew Cab Front and Crew Cab Rear Door Latching Systems. According to the cover letter signed by Jim Mrazik, Chief Engineer, Ford Systems at Intier Automotive, this was the first submittal to demonstrate compliance to FMVSS 206 utilizing the outside handle paddle revised per NB00-E-11624088-000. (Exhibit 38)

94.   A 2004 paper titled "Door Latch Vulnerability to Rollover Induced Loads" authored by Andrew Gilberg, Jeremy Buckingham, Richard McSwain, Dirk Paulitz and Mark Hood, described a latch strength test to evaluate the ability of a latch to withstand vertical forces

15

found in rollover accidents.  Vertical loads are not evaluated by FMVSS testing, yet they

are known to cause latch failure. (Exhibit 7H at 1)

95.     The authors of the 2004 paper noted that "in the well documented rollover test of a model

year 2000 Ford Econoline 15 passenger van conducted to demonstrate the Controlled

Rollover Impact System (CRIS), both the driver's and rear cargo doors opened as a result

of vertical overload failures of the latches.  The design of the latch in the Econoline

(Dortec D-21) places the detent lever above the opening into which the striker enters

(often called the "fishmouth') and the fork bolt below it.  By spreading the fishmouth, the

contact depth of the detent pawl is progressively reduced until it disengages.  The

shearing action of the striker on the latch frame vertically expands the fishmouth opening

and causes the detent pawl to disengage from the fork bolt." (Exhibit 7H at 2)

96.     According to the authors, the test developed for the 2004 paper was similar to that used

for the Z axis test of rear door latches in FMVSS 206 except the latches were fixed

directly to the test machine by their own mounting provisions rather than to an

intervening plate that can artificially enhance the strength of the frame. (Exhibit 7H at 3)

97.     The authors of the  2004 paper performed 14 tests on various latches purchased new from

dealerships.  Three tests were run on the Dortec D21 latch used in the 2003 Ford

Explorer.  All three D21 latches tested failed the test which required the latch to be able

to withstand a force in the Z or vertical direction of 2000 pounds or 8,900 Newtons (N).

Not only did all three D21 latches fail, the D21 placed number 11, 12, and 14 in terms of

strength in the vertical direction.  *See* Appendix A at end of paper. (Exhibit 7H)

98.     In the Discussion section of the 2004 paper, it is stated: "It should be noted that the D21

latch, for example, or its twin the D5 (a D21 minus most of the external levers) can be

found in some SUV and minivan liftgates.  Although it does not meet the 8,900 N

benchmark in this vertical load test, presumably it does meet the requirement when tested

according to the protocol of FMVSS 206.  A possible explanation for this is that the 3.4

mm mounting plate to which the latch is fastened for the FMVSS test artificially

strengthens the latch.  For the D21/D5 latch, this mounting plate effectively doubles the

thickness of its outer frame. (Exhibit 7H at 12)

99.    Ford's corporate representative on the PHN131 doors and door latches, James Salmon,

did not know the thickness of the mounting plate used in testing the latches for FMVSS

206.  However, Mr. Salmon testified that Ford follows the SAE requirements for the test

fixture. (Exhibit 7 at 197:11 – 199:1)

100.   SAE J839 June 1991, recommends a test fixture with a mounting plate gage of 3.00 ±

0.25 mm. (Exhibit 39 at 7)

101.   The authors of the 2004 paper reported that 11 of the 14 latches tested failed the vertical

strength test; and that the strongest latch (Mercedes Benz MB-1) tested was more than

2.32 times stronger than the weakest (D21). (Exhibit 7H at 12)

**Ford F-250 Super Cab Rear Doors as Part of the Roof Structure**

102.   In a sedan, there is a B Pillar which is the vertical member that goes from the roof to the

rocker behind the front door.  The front door latches to the B Pillar and the rear door

hinges attach to that pillar. (Exhibit 2 at 99:13 – 100:2)

103.   Ford recognizes the B Pillar is an important contributor to overall roof strength.  Other

critical components are the roof rail, the last [C] pillar, the A pillar, the windshield

header, the roof bow, and the rear header. (Exhibit 8 at 223:2 – 224:23)

104.    The performance of the roof in a rollover is dependent upon the entire system, all the pillars, the side rails, the header, the windshield, it's all part of the system. (Exhibit 2 at 47:7-10)

105.    Internal Ford documents from *circa* 1992, reporting on studies of roof crush conducted in response to proposed new NHTSA requirements extending FMVSS 216 testing to light trucks with GVW less than 6,000 pounds, reported the conclusion that in order to meet a high roof crush load, it is "primordial" to have a good B Pillar structure. (Exhibit 40 at 1, 24)

106.    There is no B Pillar in the PHN131 Super Cab. (Exhibit 2 at 99:10-16; 103:3-12; Exhibit 2B)

107.    In the four-door PHN131 Super Cab, the hinges of the rear doors attach to the C Pillar. (Exhibit 2 at 100:10-11)

108.    When the front and back doors of the Super Cab are open, it is like an open clamshell with no B Pillar.  (Exhibit 2 at 100:12 – 16; Exhibits 2A and 2B).

109.    In the Super Cab, the B Pillar was replaced by a reinforcement in the door. (Exhibit 8 at 55:9-18)

110.    The B Pillar in the PHN131 Super Cab is sometimes called a "floating" B Pillar or "moving" B Pillar which includes a vertical reinforcement inside the front edge or "shutface" of the rear door. (Exhibit 10 at 184:4-23; Exhibit 7 at 42:1– 6; Exhibit 7D at 39, photo 151)

111.    When the doors are closed, they help provide roof strength. (Exhibit 10 at 185:3-7)

112.    The Super Cab rear door upper latch is located at the top of the B Pillar.  The striker is attached to the roof rail adjacent to the upper latch when the rear door is closed. The

Super Cab rear door lower latch is located at the bottom of the B Pillar and attaches to a striker on the rocker panel. (Exhibit 7 at 114:24 – 115:9)

113.    If the latch that holds the rear door to the roof fails, the doors can open.  (Exhibit 10 at 185:20 – 186:2)

**Gross Vehicle Weight Rating (GVWR), Curb Weight, and Maximum Unloaded Vehicle Weight (MUVW)**

114.    Gross Vehicle Weight Rating (GVWR) is the value, specified by the vehicle manufacturer, for a line of vehicles as the loaded weight of a single vehicle. (Exhibit 10 at 96:15 – 98:10)

115.    The Gross Vehicle Weight (GVW) of the PHN131 F-250 line of vehicles was specified by Ford as 8,800 pounds. (Exhibit 10 at 99:7-10; Exhibit 41 at 1)

116.    The Vehicle Curb Weight or Unloaded Vehicle Weight (UVW) is the actual or manufacturer's estimated weight of the vehicle in operational status with all standard equipment and weight of fuel at nominal tank capacity and the weight of optional equipment. (40 CFR 86.082-20)

**PHN131 Early Development and Roof Crush Testing**

117.    49 CFR 571.216 (FMVSS 216) provides a roof crush test procedure for vehicles with a GVWR less than 6,000 pounds.  (Exhibit 2 at 50:8-12)

118.    FMVSS 216 requires that vehicle roof structures be able to withstand a load of 1 and 1/2 times the vehicles unloaded vehicle weight applied by a platen to either side of the forward edge of the vehicle's roof without deflecting more than five inches. (Exhibit 42)

119.    Beginning in 1991, Ford's internal safety guidelines extended the requirement for
        FMVSS 216 testing to "light trucks" or trucks with a GVWR of less than 8,500 pounds.
        (Exhibit 43 at 2)

120.    Bruno Barthelemy was the individual at Ford responsible for the design and development
        of the PHN131 body shell from January 1993 to June 1995. (Exhibit 8 at 13:4-13)

121.    Body shell is the structure that surrounds the occupants of a vehicle, including the doors,
        the roof, the pillars, the roof rails, the windshield header, the rear header, the windshield,
        and the rear window. (Exhibit 11 at 9:18-10:24)

122.    During his tenure as body shell supervisor, Barthelemy was leader of the engineering
        team  responsible for setting a target for roof strength for the PHN131 vehicles. (Exhibit
        8 at 63:22 – 64:18)

123.    There was no federal or Ford internal guideline setting a target for roof strength for the
        PHN131, so Barthelemy and his team decided PHN131 roof strength should be as good
        as the PN96 (F-150). (Exhibit 8 at 64:2-18)

124.    They set the target for PHN131 roof crush at one and a half times maximum unloaded
        vehicle weight. (Exhibit 8 at 65:3 – 66:8)

125.    The 1.5 times maximum unloaded vehicle weight target did not include a factor to take
        into consideration variations in manufacturing.  There was no 15% or 25% margin.
        (Exhibit 12 at 51:1-14; 72:7-10)

126.    Barthelemy was not looking at safety.  The engineers needed some kind of target from a
        structural engineering point of view.  They need a target so they could say this is enough
        or they need to continue, so that is how they set the target up. (Exhibit 8 at 68:16 – 72:11)

127.  Bruno Barthelemy knew that in many accident situations a rollover is inevitable when he was designing the PHN131 body shell. (Exhibit 8 at 208:8-15)

128.  Richard Vanker, who was body engineering manager for PHN131 between January 1996 and June 1998, knew it was statistically foreseeable that PHN131 vehicles would be involved in rollovers.  He knew higher center of gravity vehicles like the F-250 are more likely to roll over than standard passenger cars. (Exhibit 9 at 10:13-23; 223:12-15)

129.  No physical roof crush testing was ever performed on the PHN131 vehicles prior to Job 1. (Exhibit 9 at 116:22 – 117:17)

130.  In January 1995, a decision was made by James Wagner, of Ford's Automotive Safety and Engineering Standards office, that because "there is no REGULATORY REQUIREMENT for roof crush resistance in vehicles of more than 6,000 lbs. GVW, no actual tests are planned."  (Exhibit 44 at 2)

131.  Lou Giedeman, Compliance Assurance, concurred with James Wagner that the Light Truck Safety Design Guidelines should be followed, but because of their non regulatory aspect, CAE testing could be used very effectively. (Exhibit 44 at 2)

132.  CAE is Computer Aided Engineering.  CAE testing simulates physical testing using a Finite Element model (computerized model) that represents the vehicle design. (Exhibit 8 at 31:2 – 23:8)

133.  Information about the roof strength of the PHN131 as it was determined by CAE testing in October 1994 and January 1995 is available in a series of memos addressed to Mr. Barthelemy. (Exhibit 45)

134.   The October 11, 1994 memo indicated that CAE analysis of an X-shaped roof bow [typo in the original] yielded an increase in peak roof crush resistance from 9,600 pounds to 10,600 pounds. (Exhibit 45 at 1)

135.   The October 26, 1994 memo indicated that CAE analysis placing the proposed X-shaped roof bow in the rear showed increased front roof crush peak resistance by 1100 pounds and rear roof crush peak resistance by 1700 pounds with a weight penalty of 1.5 pounds. The resultant roof crush peak resistances were 10,700 pounds in the front, and 10,400 pounds in the rear. (Exhibit 45 at 4)

136.   The analyses described in the October 1994 memos were performed on models modified from the PN96 3 door Super Cab stretched to simulate the 4 door PHN131 Super Cab because the 4 door design was not yet available. (Exhibit 45 at 1, 4)

137.   The January 19, 1995 memo to Mr. Barthelemy reported CAE analysis placing an X-shaped roof bow in the rear and a second roof bow in the front. The resultant roof crush resistance was 10,980 pounds.  (Exhibit 45 at 8)

138.   A second CAE analysis reported on January 19, 1995 placed two (non-X-shaped) roof bows in the roof.  The resultant roof crush resistance was 10,000 pounds. (Exhibit 45)

139.   The January 19, 1995 analyses were performed on a model based on a PHN131 line drawing instead of the earlier revised PN96 model.  (Exhibit 45 at 7)

140.   Table 1, Differences Between PN96 and PHN131 Super Cab In Terms of Roof Header and Bow, provides information about the sheet metal thickness (gage) of the inner and outer roof headers of the PHN131.  The CAE analyses described in this memo were run on models assuming an inner roof header of 1.2 mm and an outer roof header of 0.9 mm. The roof bows were 1.0 mm thick. (Exhibit 45 at 7)

141.   Each of the three memos to Mr. Barthelemy bears stamps establishing the document
       retention requirements for the document.  The first and third memos require record
       retention until 2002; the second memo was to be retained until 1999. (Exhibit 45 at 1, 4,
       7)

142.   The X-shaped bow was never incorporated into the PHN131. They were meeting the roof
       crush target they had set for themselves, so there was no need to continue exploring roof
       bow designs. (Exhibit 8 at 63:4-18; 73:12-15)

143.   Ford internal documents provide additional information about the roof crush strength of
       the PHN131 vehicle in the Analytical Sign-Off for PHN131 CP Design, dated April
       1996. (Exhibit 46)

144.   Attachment 6 to the Analytical Sign-Off document, titled PHN131 Safety Status,
       provides the Roof Crush targets and Status for the PHN131 Regular Cab, Super Cab, and
       Crew Cab.  The target for the Super Cab is stated as 10,500 lb compared to the target for
       the PN96 Super Cab of 9,570.  The Status, as of April 1996, of the Super Cab Roof
       Crush, is 10,600 pounds. (Exhibit 46 at 53)

145.   By the time of the Analytical Sign-Off, the design of the vehicle is totally done. (Exhibit
       8 at 89:20 – 90:7)

146.   On July 1, 2003, for purposes of litigation, Exponent performed a roof crush test on a
       2001 Ford F-250 Super Cab Pickup according to the NHTSA FMVSS 216 testing
       procedure. (Exhibit 2 at 205:4-20; Exhibit 10 at 176:15- 177:19)

147.   The result of that test was approximately 9,800 pounds. (Exhibit 2 at 207:7-13.)

148.   The FMVSS 216 test results for the Ford F-150 was about 9,750 pounds. (Exhibit 2 at
       207:7-13; Exhibit 47)

149.  A Ford internal document dated February, 1995,  indicates that in test K50310, the F-150 Super Cab reached a peak load of 9,900 pounds on the right front roof structure.  The vehicle tested was a 1996 model with a MUVW of 5,150 pounds.  (Exhibit 48)

150.  Ford uses the maximum possible Unloaded Vehicle Weight when assessing the roof strength to weight ratio (1.5:1) to assure that all variants of a particular vehicle model comply with FMVSS 216.  For example, when determining the peak force requirement for the Econoline E150, Ford would use the MUVW of the Econoline E350.  (Exhibit 48 at Attachment 2, page 2; Exhibit 2 at 144:19 – 145:3)

151.  Ford does not agree that a manufacturer can use the UVW of the actual vehicle tested. (Exhibit 48 at Attachment 2, page 1)

152.  According to Ford's own calculations submitted to NHTSA, the PHN131 Super Cab (over 8500 lbs Pickup) has a MUVW of 7969 and would have to withstand a 14,344 lb. load to meet the 1.5 times standard of the current FMVSS 216. (Exhibit 49 at 4)

153.  The 14,344 figure includes a 20% compliance margin.  (Exhibit 49 at 4)

154.  The maximum possible Unloaded Vehicle Weight of the PHN131 Super-Cab vehicle line, identified in a Ford Vehicle Information Matrix, revised November 1, 1996, is 7,700.  (Exhibit 41)

155.  Ford has produced three Exponent test reports of a "horizontal platen" test performed on three different  Super Cab vehicles, the Ford F-250, a Dodge Ram, and a Chevy Silverado. (Exhibit 2 at 207:19 – 208:9)

156.  The purpose of the tests was to compare the F-250 to its competition. (Exhibit 2 at 208:17 -  209:1)

157.   Jeffrey Croteau refers to the Exponent testing of the Ford F-250, a Dodge Ram, and a
Chevy Silverado in his report.  He explains that the tests were run using a horizontal
platen similar to the rigid horizontal platen defined in the FMVSS 571.220.  This is a test
to be used for school busses.  Mr. Croteau does not offer any explanation for why this test
was chosen rather than FMVSS 216. (Exhibit 50)

**The PHN131 CAE Roof Crush Testing Documentation is Missing**

158.   FEA modeling and CAE testing is expensive.  It takes weeks to prepare a model. Once a
model is developed for roof crush testing it can be used again and again, but to test
revisions in the vehicle it might take one or two days for a  highly paid analyst to make
the revisions in the FEA model.  The cost of these additional analyses is in the range of
$10,000 per study. (Exhibit 8 at 233:23 – 235:13)

159.   Ford rented or leased space on a university super computer to run the CAE analysis for
the PHN131 project. (Exhibit 8 at 235:14 – 236:9)

160.   Early in the development phase of a vehicle, CAE testing is used because there are no
physical prototypes of the vehicle in existence.  Once the physical prototypes are
produced, it is less expensive to perform physical roof crush testing than CAE testing.
(Exhibit 8 at 236:22 – 238:1)

161.   Ford does not have a copy of the CAE test on which the Analytical Sign-Off for roof
crush is based. (Exhibit 10 at 147:15 – 22)

162.   In 2003, in the *Parker v. Ford* litigation, Eastern District of Texas, 02CV-182 (DF), Ford
was ordered by Magistrate Judge McKee to provide plaintiff's counsel with an affidavit
regarding Ford's search for finite element analysis reports regarding the roof structure of
the P131 platform vehicles and the finite element models for that platform. (Exhibit 51)

163. Thomas Patterson testified that he provided affidavits to the plaintiff in *Parker v. Ford*, outlining the steps he had taken and the people he had interviewed in his attempt to locate the finite element models and roof strength test results using those models.  (Exhibit 10 at 115:21 – 119:8)

164. According to the Patterson affidavits, Ford was unable to locate either the finite element models or the CAE test results using the models for the PHN131 platform vehicles. (Exhibit 10 at 119:8)

165. At first, Mr. Patterson thought he had located a model, but it turned out to be a model for the roof of an Excursion developed for NVH (noise, vibration, and harshness) testing and not roof strength testing. (Exhibit 10 at 124:13 – 125:19)

166. On July 20, 2005, Mr. Patterson was Ford's corporate representative on roof crush at a Rule 30(b)(6) deposition in *Ott v. Ford*, WDKy 03-101 (M). (Exhibit 10 at 8.)

167. By the date of Mr. Patterson's deposition in *Ott v. Ford*, Ford had still not located the models or test reports for roof strength testing. (Exhibit 10 at 119:10-24.)

168. The only finite element models of the PHN131 platform roof structure Ford has produced in the instant case are models developed or built in 2005. (Exhibit 52 at Response #22)

**Changes in the F-250 Roof Structure <u>After</u> the April 1996 Analytical Sign-Off**

169. Even as early as January, 1996, Ford was planning to take aggressive action to reduce the cost of the PHN131 pickup post Job #1, *i.e.*, after January 5, 1998.  The plan was to reduce the cost per unit by $358 six months after launch – to maintain the variable profit margin for 1999. (Exhibit 7J at 17, 21)

170.   In 1998, the PHN131 Vehicle Line Team committed to cost reductions totaling $1,000 per pick up.  Of that figure, $150 was to be reduced via design cost reductions in material. (Exhibit 53)

171.   A Release/Concern Notice is an engineering change that is made to a part or a system in a vehicle.  (Exhibit 9 at 28)

172.   A Concern Detail is the justifying document for the engineering change.  (Exhibit 10 at 168:16-20)

**Windshield header outer deleted**

173.   As of June 3, 1996, Ford's design for the PHN131 pickup windshield header included: "One new windshield header assembly common for all models.  Header assembly includes header inner/header outer stampings, and PIA expandable extruded sealer." (Exhibit 54 at 3)

174.   On July 12, 1996, Ford approved the deletion of the front header outer from the PHN131 vehicles design. (Exhibit 10 at 168:9-15; Exhibit 55)

175.   The windshield header inner and outer form a box shape.  The header inner is hat-shaped; that is it comprises three sides of the box, while the header outer is like the cover or the fourth side of the box. (Exhibit 10 at 169:1-15)

176.   With the header outer welded to the header inner, the shape is "boxed."  Without the header outer, the header inner shape is "open."  As a general rule, a boxed section is stronger than an open section.  (Exhibit 10 at 169:16-170:1)

177.   The deletion of the windshield outer saved Ford $3.50 per vehicle and $500,000 in tooling costs. (Exhibit 10 at 181:13-19; Exhibit 55 at 2)

**Windshield header inner downgaged**

178.  On August 8, 1999, Ford authorized a down gage from 1.2 mm to 1.07 mm for the windshield header inner.  This was an 11% decrease in thickness for a cost savings of $0.17 per vehicle. (Exhibit 10 at 193:25 – 194:11; Exhibit 56; Exhibit 57)

**Roof bows downgaged**

179.  As of December 22, 1994, the design for the Super Cab included two roof bows. (Exhibit 58 at 4)

180.  Prior to March 28, 1996, Ford's design for the PHN131 pickup Super Cab included three roof bows, a front roof bow and 2 rear bows. (Exhibit 54 at 3)

181.  As of March 28, 1996, the design changed to include only 2 "unique" bows including PIA expandable sealer attached with welds to the roof sub-assembly. (Exhibit 54 at 3)

182.  As of May 22, 1996, the design called for two new roof bows.  The bows are stamped and include 2 strips of PIA expandable extruded sealer the length of the part.  The bows are sub-assembled to the roof panel via welds to the water management ditch on either end of the bows. (Exhibit 54 at 3)

183.  As of June 3, 1996, the two roof bows are described as "stamped and includes 2 strips of PIA expandable extruded sealer." (Exhibit 54 at 3)

184.  On November 27, 1995, the roof bows (roof reinforcements) were redesigned and redrawn.  The new bow metal was 0.8 mm thick, downgaged from 0.9 mm.  This was a reduction in thickness of 10.1%.  (Exhibit 10 at 166:16 – 168:6; Exhibit 59)

185.  On August 10, 1999, a design change was approved that downgaged the roof bows from 0.8 mm to 0.74 mm.  This was a 7.5% reduction in thickness and resulted in a cost

savings of 5 cents per bow or 10 cents per super cab vehicle. (Exhibit 10 at 194:13-24; Exhibit 60)

186.   When you reduce the thickness of steel, you tend to lessen the structural capacity. (Exhibit 13 at 30)

**A-Pillars downgaged**

187.   The Front Body Pillar Assembly or A-Pillar is the part of the vehicle to which the windshield and the front door hinges are attached. (Exhibit 9 at 29:22 – 31:16; Exhibit 61)

188.   As of May, 1997, the PHN131 A-Pillar was designed to be 2.5 mm thick. (Exhibit 10 at 188:17 – 189:4)

189.   On September 18, 1998, Ford authorized the downgaging of the A-Pillar from 2.4 mm to 2.35 mm.  A downgage of 2%, for a cost savings of $0.70 per vehicle and no tooling cost. (Exhibit 10 at 192:7-14; Exhibit 62; Exhibit 63)

190.   On March 30, 1999, Ford approved a down gage of the A-pillar from 2.35 mm to 2.2 mm.  This was a downgage of 6.4% with a cost savings of $0.86 per A-Pillar or $1.72 per vehicle.  (Exhibit 10 at 192:16-193:12; Exhibit 64; Exhibit 65)

**Floating B-Pillar downgage and downgrade**

191.   On December 4, 1996, Ford authorized the replacement of the Boron steel, Super Cab rear door front vertical beam with a vertical beam made of mild steel.  The vertical beam is what Ford generically called the "floating B-pillar."  (Exhibit 10 at 184:4 – 185:2; 186:15 -22; Exhibit 66; Exhibit 67)

192.   Replacing the Boron steel part with a mild steel part saved $20.86 per vehicle and tooling costs of $1,033,800.  (Exhibit 10 at 186:24 – 187:7)

193.    The gage thickness of the Boron steel strainer (vertical beam) was a minimum of 1.4 mm. (Exhibit 68 at 4)

194.    The gage thickness of the mild steel replacement part was a minimum of 1.4 mm. (Exhibit 69at 4)

195.    Boron steel is very high strength steel that provides a very rigid structure.  (Exhibit 10 at 154:15-18)

196.    Boron steel is 4 or 5 times stronger than normal steel. (Exhibit 10 at 155:19 – 156:20)

197.    On June 15, 1999, Ford authorized the downgage of the Super Cab rear door front vertical beam from 1.5 mm to 1.2 mm.  The 20% downgage resulted in a savings of $0.48 per door or $0.96 per vehicle.  (Exhibit 10 at 193:15-23; Exhibit 70)

198.    On September 27, 2001, Ford authorized the upgage of the Super Cab rear door vertical beam from 1.2 mm to 1.5 mm and changed the material from cold rolled to hot rolled steel for a cost savings of $0.28 per vehicle.  (Exhibit 71)

199.    This change was initiated because the sheet metal was cracking under the rear supercab driver's door striker and the Super Cabs were "chucking" (making noise) over rough roads.  CAE indicated stresses in the striker area increased approximately 35% when the part was downgaged from 1.5 to 1.2 mm.  (Exhibit 72)

200.    Due to timing concerns, the upgage would not occur before December 27, 2001 at the earliest.  Ford buys the steel for the part, Tower stamps the part for Budd.  Tower required 12 weeks for the change, and Budd requires about 4 weeks, but it was unknown if part or all of the 4 weeks was in parallel or series.  (Exhibit 72 at 3)

**Roof Crush CAE Testing to Determine the Effect of Structural Downgages**

201.   None of the Concern Details or Concern Notices about structural downgaging contains any information that additional computer (CAE) testing was done in response to the changes. (Exhibit 10 at 204:13-21)

202.   Ford has no test results to show what affect any of the downgages in roof and door structures had on the roof crush strength of the PHN131. (Exhibit 10 at 214:14 – 215:18)

**Projected Number of PHN131 Vehicles to be Sold per year**

203.   In September 1997, the projection was that Ford would produce a total of 327,787 PHN131 vehicles at its two production plants located in Kentucky and Mexico in 1998. (Exhibit 73)

**Ford "Tough Truck" Image**

204.   "Built Ford Tough" is an image that Ford is very proud of.  It is an image Ford has had for all its trucks, in fact, Ford used to be called the tough truck center. (Exhibit 8 at 314:2 – 316:25)

205.   In 2001, 2002 Ford produced a series of television commercials touting the F-Series trucks as "tough." (Exhibit 74)

**Evidence of Other Roof Crush Litigation Involving PHN131 Vehicles**

206.   *Taylor v. Ford* is not the only litigation against Ford alleging roof crush involving PHN131 vehicles.  Ford provided Plaintiff with documentation of forty-two complaints filed against Ford involving PHN131 F-250s (25), F-350s (12), F-450s (4) and one unidentified PHN131 model claiming injury or death related to roof crush in a rollover. (Affidavit of Sarah D. Littlefield at ¶¶ 9-13; Exhibits 75A-75XX)

**Ford Motor Company's Corporate Philosophy on Roof Strength in Relation to Occupant Injuries in a Rollover**

207.    It is Ford's position that roof strength performance in the 216 test has no relationship to the risk of injury in a rollover collision.  (Exhibit 14 at 14:13 – 15:5, 35:11-19)

208.    It is Ford's position that the peak loading on the head and neck of the seat-belted occupant occurs prior to any significant roof deformation in a rollover.  (Exhibit 14 at 50:10-14)

209.    Because Ford Motor Company does not have a requirement for vehicles over 8,500 pounds, and they designed the PHN131 to meet the standard for a light truck, Ford feels it is providing safety above what is reasonable. (Exhibit 8 at 283:14-25)

210.    In 1997, Ford wrote a letter responding to a request from the General Accounting Office for comments on a proposal to extend, *inter alia*, FMVSS 216 to "light trucks" with a GVWR of 10,000 pounds or less.  Ford asserted that the regulation should not be extended because "no safety benefit has resulted from FMVSS 216 as applied to passenger cars and none is anticipated for light trucks.  Additionally there is no accident experience to establish a safety need for a standard being applied to light trucks."  Ford's position was summarized as "Ford would object to FMVSS 216 being extended to light truck products since no safety need has been demonstrated.  Further, Ford believes that its current and planned light truck products provide adequate roof crush protection in case of roll-over."  (Exhibit 76 at 5, 30)

211.    Ford does recognize the importance of keeping the doors closed in an accident.  Ford's letter to Barry Felrice, the Associate Administrator for Rulemaking at NHTSA, dated May 22, 1990 states: "Ford has observed that National Accident Sampling System (NASS), Fatal Accident Reporting System (FARS), and various other accident data have

consistently shown that vehicle occupants are less likely to be seriously injured in an accident when they are contained within the vehicle.  Providing an accident does not cause massive damage to the body structure and allows the passenger compartment to remain reasonably intact, containment is usually achievable when occupants are properly restrained using the seat belts provided by manufacturers, doors provided for occupant ingress and egress remain closed and glazing remains intact." (Exhibit 77 at 3)

**NHTSA's Position on Roof Strength in Relation to Occupant Injuries in a Rollover**

212.   In 2001, NHTSA requested comments from the public regarding an upgrade of the FMVSS 216 requirements "to reduce injuries and fatalities in passenger cars, pickup trucks, vans and multipurpose passenger vehicles resulting from roof intrusion during rollover crashes."  According to information provided by NHTSA in this request for comments, "roof crush intrusion is estimated to occur, and potentially contribute to serious or fatal occupant injury in about 26% (6,934/26,376) of the rollover crashes." (Exhibit 77 at 3)

213.   NHTSA reported that it had conducted an analytical study of the relationship between roof intrusion and severity of injury and had reached the following conclusions: 1) Headroom reduction (pre-versus post-crash) by more than 70% substantially increased the risk of head injury from roof contact; 2) head injury increased when the post crash headroom was less than the original headroom.  Also, as the severity of the injury increased, the percentage of cases with no remaining headroom increased; 3) when the intrusion exceeded the original headroom, the percentage of injured occupants was 1.8 times the percentage of uninjured occupants; and 4) the average percent of headroom

reduction for injured occupants was more than twice that of uninjured occupants. (Exhibit 77)

**Identity of Individuals Deposed in other litigation**

214.   Thomas F. Patterson is a design analysis engineer for Ford.  In that role, he frequently assists Ford in litigation.  In the *Ott v. Ford* case, he was a 30(b)(6) representative for Ford on roof crush issues. (Exhibit 10 at 5:1 – 8:22)

215.   Bruno Barthelemy was body shell supervisor for the PHN131 program from January 1993 to June 1995.  Mr. Barthelemy was deposed two times in the Parker case.  In first deposition, transcript volume 1, pages 1 – 147, Mr. Barthelemy was a fact witness.  In the second deposition, Volume 2, pages 148 – 320, Mr. Barthelemy was Ford's 30(b)(6) designee. (Exhibit 8 at 13:4-20)

216.   Richard Vanker was the body engineering manager on the PHN131 program from January 1996 to June 1998 after Job One. (Exhibit 9 at 10:12-23)

217.   Carl Zaas was closure (doors) supervisor for the PHN131 program in 1993, 1994.  He then became body shell supervisor in April or May, 1995. (Exhibit 11 at 7:17 – 8:4; 9:4)

**Alternative Designs**

218.   Bruno Barthelemy set up a target for roof crush for the PHN131 program so that the engineers would have a target to meet, so they would know when to stop. (Exhibit 8 at 68:16 – 70:4)

219.   If someone had come to Bruno Barthelemy and said he was to design the roof structure of the PHN131 pickup to withstand two times gross vehicle weight with only two inches deflection, he absolutely could have come up with a structure that met the requirement. (Exhibit 8 at 70:5-12)

220.   Mr. Barthelemy could have designed the roof to be three and a half, five, or ten times the maximum unloaded vehicle weight if asked.  The vehicle at 3.5 x could have been very similar in appearance, but heavier. (Exhibit 12 at 68:1 – 69:14)

221.   If Ford had asked Mr. Vanker to design a roof capable of withstanding 2 x GVWR, he could have designed a vehicle to meet the target. (Exhibit 9 at 255:7-16)

222.   Ford vehicle engineers have available to them a "tool box" of means to improve roof strength including foam, high strength bake hardened steel and boron steel. (Exhibit 12 at 34:4-16)

223.   The majority of the steel in the PHN131 is cold rolled steel.  High strength steel has a higher level of yield, so you can use a lighter gage and have the same performance in bending, in large deformation.  But it is more difficult to stamp.  They used high strength steel for some of the reinforcements, but no boron steel. (Exhibit 8 at 108:9 – 109:12)

224.   Volvo, owned by Ford, made the following statements in a commercial: "In a rollover accident a large part of the vehicle is exposed to external forces.  Keeping the passenger compartment intact is first and foremost a task for the vehicle structure, including the roof pillars and transverse roof profiles, as they absorb a large part of the forces when the vehicle starts to roll.  They form an interactive web of steel profiles, of which the most crucial parts are made of high-strength boron steel.  In fact, the roof strength of the XC-90 exceeds the legal requirements in the U.S.A. by more than 100%." (Exhibit 9 at 83:18 – 85:16)

225.   The tensile and yield strengths of the boron steel used in the XC-90 would be quite a bit higher than the steel used in the PHN-131. (Exhibit 9 at 88:19 – 90:5)

226.   Boron steel is four to five times stronger than normal steel. (Exhibit 10 at 155:19 – 156:20)

227.   Boron steel was being used in Ford automobiles, at least in the 1996-1998 timeframe. (Exhibit 9 at 93:11-18)

228.   There are other high-strength steels that were capable of being used that had more tensile strength than the ones used in the PHN131 platform.  (Exhibit 9 at 94:19-22)

229.   Exhibit 40, Roof Crush study report, demonstrates that Ford is capable of increasing roof strength to meet higher targets simply by adding reinforcements to the roof structure and/or varying the type of steel used.  For example, the Aerostar with a sliding door behind the front door on the right did not meet the 1.5 x target on the right and did not meet the target plus Ford's 20% margin on the left.  The windshield header was redesigned from an open section to a closed section by adding a reinforcement of Bake Hardenable Steel (BHS) .8 mm thick.  The material of the windshield header was changed from Cold Rolled Steel .7 mm thick to BHS .8 mm thick.  The material for the A Pillar inner and A Pillar reinforcement was changed from CRS to BHS.  These changes alone improved the roof crush load by over 1,000 pounds.  An additional 1,000 pound improvement was made by extending reinforcements in the B Pillars and adding welds. (Exhibit 40 at 17, 18)

230.   Jamil Alwan worked for Ford as a consultant engineer from 1996 to 2001 and as a full time employee since 2001.  Most of that time was spent doing basic research in alternative materials for Ford. (Exhibit 13 at 6:1 – 10:2)

231.   Mr. Alwan is one of the authors of a May 1996 internal Ford document titled "Crashworthiness and Energy Management of Polyurethane Foam-Filled Structural

Components."  The paper reported on a study to investigate new technologies for reducing the weight of vehicles by reducing steel thickness by compensating with structural foam.  (Exhibit 13 at 29:4 – 31:7; Exhibit 13A)

232.  The Background section of the paper stated that "during the structural phase of the project, i.e., third phase, high strength steel was considered as an alternate approach to reduce body weight by reducing body structure gages.  However, gage reduction usually leads to the increase of structural instability due to early local buckling of thin-walled structural components . . .   This phenomena [sic] of instability, due to local buckling, prompted to the proposition of using polyurethane foam in structural members.  Once foam is injected in a structural component, it enhances the structural stability of that member by delaying the local buckling initiation process.  This increases the member's maximum strength, thus attaining higher collapse loads." (Exhibit 13A at 8)

233.  As part of the study, a Ford Taurus was injected with structural foam in the A Pillar, the roof header, and the B Pillar. The Taurus was then subjected to FMVSS 216 testing and the results showed a 15 to 18% increase in strength of the Taurus roof. (Exhibit 13 at 35:25 – 37:18)

234.  The study concluded that depending on the type of foam used and the section size and section thickness, you can get anywhere from 17 to 27% increase in strength. (Exhibit 13 at 50:19 – 51:1)

235.  In 1999, Mazda issued a press release to announce it had developed a new technique to strengthen the vehicle body frame with structural foam.  The technology was being used for the first time in the Freestyle Door System of the EVOLV concept car.  The Freestyle

"although possessing no "B" pillar, boasts a strong body and top class performance against side collision."  (Exhibit 13B)

236.   Structural foam was used in the Upper B Pillar, and Upper and Lower D Pillars on the 2003 Expedition and Navigators. (Exhibit 78)

237.   The Volvo XC90 has a strength to weight ratio of 3:1 (Exhibit 14 at 64:2-10)

238.   Ford expert Jeffrey Croteau refers in his report to a July 17, 2006 43 mph dolly rollover test of the Volvo XC90 performed by Exponent at Ford's request.  The video of this test demonstrates that the Volvo's  strength to weight ratio of 3:1 is sufficient to withstand 4 1/2 rolls with minimal roof deformation.  Indeed, Mr. Croteau reports that "the plastic deformation to the windshield header or tops of the A, B, C, or D Pillars was no more than approximately 2 1/4 inches.  There was deformation to the roof rail between the left B and C pillars of 4 inches attributed to the roof rolling over one of the ejected dummies. (Exhibit 50 at 21, 22; Exhibit 79)

239.   Several vehicles, including the Honda Element, Mazda 6, Subaru Forester, and Ford Fusion have strength to weight ratios of 3:1 as of March 2006. (Exhibit 14 at 64:24 – 65:25).

Dated: January 11, 2008                    /s/ Samuel W. Lanham, Jr.
                                           Samuel W. Lanham, Jr.
                                           Attorney for Defendant
                                           Lanham Blackwell, P.A.
                                           470 Evergreen Woods
                                           Bangor, ME  04401

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 11, 2008, I electronically filed the within Plaintiff's

Statement of Additional Material Facts, with the Clerk of the Court utilizing the CM/ECF

system.  Said system will send notification of this filing to the following individuals:


James Campbell, Esq.
Campbell, Campbell, Edwards & Conroy, P.C.
1 Constitution Plaza, 3d Floor
Boston, MA 02129-2030

Christopher Callanan, Esq.
Campbell, Campbell, Edwards & Conroy, P.C.
1 Constitution Plaza, 3d Floor
Boston, MA 02129-2030

David Rogers, Esq.
Campbell, Campbell, Edwards & Conroy, P.C.
1 Constitution Plaza, 3d Floor
Boston, MA 02129-2030


Date:  January 11, 2008                /s/ Samuel W. Lanham, Jr., Esq.
                                       Samuel W. Lanham, Jr., Esq.